| COPPERHEAD AGRICULTURAL PRODUCTS, LLC, a South Dakota Limited Liability Company, and COPPERHEAD CONCAVE LLC, a South Dakota Limited Liability Company, | CIV. 18-4127 |
| --- | --- |
| | (REDACTED) |
| Plaintiffs, | MEMORDANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION; DENYING PLAINTIFFS' MOTION FOR PRELIMINARY AND DECLARATORY RELIEF; DENYING DEFNDANTS' MOTION TO STAY |
| vs. | |
| KB AG CORPORATION, LLC, KIMBER MITCHELL, and BRIAN ROBERTSON, | |
| Defendants. | |

Copperhead Agricultural Products, LLC and Copperhead Concave LLC (collectively referred to as, "Copperhead") are the plaintiffs in this matter and KB Ag Corporation, LLC, Kimber Mitchell, and Brian Robertson are the defendants in this matter ("Defendants"). Pending before the Court are the following motions: (1) Defendants' Motion to Dismiss, Doc. 14; (2) Copperhead's motion to set hearing for preliminary injunctive relief, Doc. 23; (3) Copperhead's motion for preliminary and declaratory relief, Doc. 26; (4) Mitchell and Robertson's motion for joinder, Doc. 42; (5) Copperhead's motion to compel discovery, Doc. 43; and (6) Defendants' motion to stay, Doc. 66.

For the forgoing reasons Defendants' motion to dismiss for lack of personal jurisdiction is denied; Copperhead's motion to set hearing for preliminary injunctive relief is denied; Copperhead's motion for preliminary and declaratory relief is denied; Mitchell and Robertson's motion for joinder is granted; and Defendants' motion to stay is denied. The Court will address the remaining claims in Defendants' motion to dismiss in a separate memorandum opinion and order. Copperhead's motion to compel discovery has been referred to Magistrate Judge Veronica Duffy.

## BACKGROUND

I.      **Don Estes Joins CM Welding**

From March 1, 1960 until 2003, Don Estes owned a business named Estes Manufacturing in Flanagan, Illinois. Doc 21, ¶ 2.

Don Estes is the patent holder of certain concave technologies that, it is alleged, are affiliated with his name in the agricultural machinery industry. Doc. 1, ¶10. The patents cover certain concave products that attach to farm machinery such as combines and are used to secure a more efficient harvesting process. Doc. 1, ¶10.

The patents that are registered in Don Estes's name that are the subject of this action are the following: (1) US 8,454,416 B1; (2) US 8,690,652 B1; and (3) a reissue of patent US 8,690,652 B1 as US RE46,401 E. Doc. 1, ¶ 14.

Beginning in as early as February 7, 2011, Don Estes began working for CM Welding, Inc. ("CM Welding"), a company in Frankfurt, Indiana, owned by Carolyn Mitchell Estes. Doc. 63-5. A screenshot from CM Welding's website, dated February 7, 2011, states as follows:

> Home of the Disrupter.
>
> Meet Don Estes, the inventor of "The Disrupter," a tool designed to reduce rotor loss in corn and roping green stem soybeans on modern combines.
>
> Don Estes owned & operated Estes Mfg. Co. in Flanagan, IL for 43 years. He retired in 2003 and has recently been involved in a new business located in Frankfurt In. as a consultant. C M Welding is now taking on all of Don's products and services. You may call Don any time for a free consultation about anything involving combines and thrashing. He has had a lot of experience in this field and would be happy to talk to you.

Doc. 63-5. Although CM Welding indicated on its website that Don Estes was acting as a "consultant" for CM Welding, CM Welding argues that Don Estes was, in-fact, an employee of CM Welding. Doc. 67 at 2. CM Welding points to W-2 forms of Don Estes from CM Welding for the years 2012 to 2018 to support it contention that Don Estes was an employee. Doc. 63-1. Don Estes states that distributions from CM Welding went into a joint account owned by he and Carolyn Estes and that they both used the money from that account. Doc. 71, ¶5.

A screenshot of the CM Welding website dated May 31, 2013, reiterated Don Estes's biography in full, that CM Welding was taking on Don's products and services, and that Don was available for a consultation about anything involving combines and thrashing. Doc. 63-6. This

time, however, CM Welding was advertising a different product—the RPR Thrashing/Seperating (sic) Concave System Estes Disrupter Kit. Doc. 63-6. Specifically, the website stated, in part:

> CM Welding Inc introduced "The Disrupter" . . . in the summer of 2010 and the response was tremendous. . . . We have over 1700 sets in operation, but the rotor loss problem still exists with all STS & new S series machines when ground speed is increased. The rear concave in John Deere Rotor machines is not large enough nor open enough to get crop through without sacrificing a lot of ground speed. Corn, soybeans and wheat thrash completely over the first 1 & 1/2 round bar concaves, but very little separation will happen over the back half of the concave sections due to the small space (5/8") between the remaining round bars.

> CM Welding Inc. has designed a concave/grate that has 1/2" sq bars with 1 ¼" opening between. The new concave/grate will replace the rear concave on all of the STS & S series machines. The ½" Square bars plus the 11/4 space between the bars will increase material flow by 68%. The more crop volume you can get out of the concave section, the less has to be separated over the grate section. SO SLOW DOWN TO KEEP CROP IN OR ADD THE ESTES ROTOR LOSS KIT & GO!

Doc. 63-6.

While at CM Welding, Don Estes communicated with customers and potential customers about CM Welding products and services and was interviewed by multiple media outlets to promote CM Welding products. Doc. 21, ¶¶ 7-8, Exs. A, B. Don Estes stated that he authorized CM Welding to use his name on its website and Facebook pages because he was married to the owner, Carolyn Estes. Doc. 21, ¶ 5. Don and Carolyn Estes are currently in divorce proceedings. Doc. 15, ¶ 6.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

The "Estes RPR Concave Systems" appeared in advertising as of 2014. Doc. 52-7. In the 2015 fall/winter edition of Western Farm, Ranch & Dairy Magazine, CM Welding placed an add for "Estes RPR Concave Systems." Doc. 52-7. In the advertisement, there was no mention of Don Estes other than directing potential customers to call "Donnie" at CM Welding Inc. Doc. 52-7.

People in the industry knew that certain products sold by CM Welding were designed by Don Estes. An online post from "The Combine Forum" on July 9, 2013, stated that a person in

the industry "was thinking about trying the rpr concaves with disrupters from c&m welding. I talked with Donnie Estes and he gave me some customers's numbers and they all liked them. Had anyone tried them in a system?" Doc. 63-11. On July 11, 2013, a poster stated that he had "not run the RPR concaves, but have run the 5/8" square bar concave (1 ¼" openings) and disrupters from Donnie in 9870s and s680s" This looks like his 3rd concave in the RPR system, but the brochure talks about round bars; so I guess I'm not sure." Doc. 63-11. That same day, another poster stated that "[i]n soybeans, we ran a normal large wire in position one and two and Donnie's square bar in position three and [p]ulled the Disrupters square bar in position three. . . . If Donnie would build a front square bar, I'd run three squares in corn and never look back." Doc. 63-11.

On July 28, 2016, Carolyn Estes registered the domain names: rprperformanceconcaves.com and estesperformanceconcaves.com. Doc. 63-7.


## Formation of KB Ag, Corp. and Actual Confusion and Likelihood of Confusion

In mid-August 2017, just prior to KB Ag's formation, Mitchell and Robertson were marketing RPR Concaves on behalf of CM Welding at DakotaFest, held over two days in Mitchell, South Dakota, under the brand name "Estes Performance Concaves," and encouraged attendees to "see us in the Ag Tent – Booth 3304." Doc. 20-12.

On August 24, 2017, Mitchell filed an application with the U.S. Patent and Trademark Office, seeking to register the "RPR Concaves" trademark as the first to use in commerce. Doc. 1, ¶ 30. An assignment of the "RPR Concaves" trademark to CM Welding Inc. was recorded with the United States Patent and Trademark Office ("USPTO") on May 20, 2018. Doc. 58-1. On September 10, 2019, the USPTO registered the mark "RPR" in association with agricultural machinery, namely harvesters. Doc. 74. This is a registration on the Principal Register in favor of owner CM Welding. Docs. 74; 74-1.

On September 5, 2017, KB Ag was organized and registered in Texas. Doc. 15, ¶ 8. KB Ag's principal place of business is in Frisco, Texas. Doc. 15, ¶ 3. Mitchell and Robertson are the owners and Carolyn Estes is the director of KB Ag. Doc. 15, ¶¶ 1, 10. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████

In mid-September 2017, Don Estes appeared with Mitchell and Robertson on behalf of CM Welding in a publicity session with American Farmer to discuss "Estes Performance Concaves." Doc. 21-6.

Whereas the agricultural products online forums in 2015 referred to RPR Concaves as "CM Welding RPR Concaves," Doc. 63-11, in 2017, online forums began referring to them as Estes RPR Concaves. Doc. 21-3; 21-4; 21-5.

In late October 2017, Don Estes left Indiana to spend time in Florida during the cold season and returned to Indiana in early 2018. Doc. 21, ¶ 12. In March 2018, a customer in Perryville, Missouri, Timothy Gremaud ("Gremaud"), who had purchased a RPR Concave in late 2017, decided to purchase another RPR Concave. Doc. 22 ¶¶ 3-4. Gremaud called Estes Performance Concaves utilizing the information packets that were sent with the first RPR Concave that he purchased believing that he was purchasing the same RPR Concave he already owned directly from Don Estes. Doc. 22, ¶ 5. Gremaud discovered that the concave product that he had been sold was not the same as the RPR Concave that he had purchased earlier. Doc. 22, ¶ 10. The company referenced on the invoice enclosed with the concave product he received was KB Ag. Doc. 22, ¶ 11.

Gremaud called Don Estes's personal number to explain the situation. Doc. 22, ¶ 15. He indicated that Don Estes was "dumbfounded" that Gremaud's efforts to purchase another RPR Concave through channels he had used previously resulted in the purchase of an entirely different concave product and Don Estes went to Missouri to assess the situation. Doc. 22, ¶¶ 16-17. Don Estes provided Gremaud with a new RPR Concave and indicated that he would return the other concave, which Gremaud later learned was an XPR Concave manufactured by KB Ag. Doc. 22, ¶ 18.

Gremaud did not believe that at the time that KB Ag sent shipped its XPR concave to him that the product had been field-tested and believes the XPR concave to be an inferior product. Doc. 22, ¶¶ 20-21.

On April 1, 2018, a screen capture of the estesperformanceconcaves.com website shows product testimonials about the RPR Concaves, with specific individuals identified by name and place. Doc. 20-16. A phone number is listed at the bottom of the page and the following narrative appears under the heading "About Estes Concaves"

> Don Estes, as an agricultural equipment welder by trade, invented and patented the Disrupter for Case IH and John Deer rotary combines in the 90s. Since, Estes has developed and patented the class-leading RPR Concave System that improves capacity, eliminates rotor loss and threshes all crops with one concave system.

Doc. 20-16.

On May 29, 2018, the trademark "Estes Concaves" was registered in Robertson's name. Doc. 14, ¶ 10; Doc. 52-8. The trademark "Estes Performance Concaves" was filed in Robertson's name on March 13, 2018, but it is unclear from the record if it has been registered. Doc. 16-3.

On July 26, 2018, the annual Ag PhD Field Day event was held in Baltic, South Dakota, and was attended by over 10,000 people with ties to the agricultural community. Doc. 20-8. KB Ag, marketing itself as Estes Performance Concaves, was one of the approximately 28 listed sponsors of Ag PhD Field Day and "Estes Performance Concaves" was listed prominently as a sponsor on the marketing materials involving Ag PhD Field Day. Docs. 20-10; 20-11. It was there, that "Estes Performance Concaves" officially "unveiled" its "new XPR Concaves" and urged attendees to stop by its booth. Doc. 20-9.

On August 8, 2018, a screen capture of the www.estesperformance.com website showed the same phone number at the bottom of the page that had been listed on the website in April 2018, but the heading "About Estes Concaves," on the site had been changed to read:

> We have engineered and developed the most advance concave system that threshes all crops, eliminates rotor loss, improves grain quality, gives you a cleaner sample – all with one set of concaves.

Doc. 20-17. Explicit references to the RPR system and to Don Estes had been removed, and in their place KB Ag had "testimonials" from unnamed clients and statements about unspecified products. Doc. 20-17.

In August 21-23, 2018, Defendants attended the DakotaFest Farm Show in Mitchell, South Dakota, which featured agricultural events and activities. Doc. 1, ¶ 37. The year prior at DakotaFest, Defendants had been marketing RPR Concaves for CM Welding under the Estes Performance Concaves brand name.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████.

Copperhead

In May 2018, just prior to KB Ag's launch of the XPR Concaves into the wider marketplace, Don Estes contacted Mr. Jass of Copperhead Agricultural Products ("Copperhead Ag") to determine whether Copperhead Ag had any interest in purchasing CM Welding. Doc. 21, ¶ 23. Don Estes provided Copperhead Ag with information relating to CM Welding's financial position and other due diligence information and Don Estes states that this was done with Carolyn Estes's knowledge. Doc. 21, ¶ 25. Ultimately, Copperhead Ag did not make a formal offer to purchase CM Welding. Doc. 21, ¶¶ 25-26.

At some point in the summer of 2018, Don Estes learned that Carolyn Estes held a position with KB Ag, but was not clear on her specific involvement. Doc. 21, ¶ 28.

By mid-July 2018, CM Welding was in arrears with Durre Bros. Welding & Machine Shop, Inc. ("Durre Bros."), its exclusive manufacturer, for certain inventory it had ordered. Doc. 20-3; Doc. 21, ¶ 14. Rather than pay for the inventory, CM Welding proposed that Copperhead Ag satisfy its debt which, according to an invoice from CM Welding to Copperhead Ag, totaled $76,648.67, and receive the inventory directly from Durre Bros. Docs. 21, ¶ 30; 20-3; 20-7. Marc Durre, President of Durre Bros., stated that it was his understanding that as part of this transaction, Copperhead would be able to sell the concave products to third party purchasers and CM Welding would no longer be in engaged in the business. Doc. 70, ¶ 3. Durre Bros. has not manufactured any concave products on behalf of CM Welding since July 2018, although CM Welding continues to market RPR Concaves. Doc. 70, ¶ 4; 63-10. Don Estes believes that Carolyn Estes understood that Copperhead Concave would sell the RPR Concaves under the Copperhead name and would market the product by referencing Don Estes's name and his patented technology. Doc. 21, ¶ 31.

On July 20, 2018, KB Ag engaged an attorney in Texas to serve a letter to Don Estes and Copperhead Ag, stating that Don Estes, as a representative and agent for Copperhead Ag, "has an continues to 1) defame KB Ag []; 2) tortuously interfere with KB Ag'[s] customers and business relationships and 3) unlawfully appropriate the services and sponsorship of KB Ag [] products". Doc. 15, ¶ 11; 15-1. The letter states the failure to cease and desist such conduct may result in KB Ag filing a lawsuit seeking economic damages for defamation, libel per se, tortious interference with contractual relations, unjust enrichment and unlawful misappropriation. Doc. 15-1.

On July 24, 2018, counsel for Copperhead Ag confirmed receipt of the July 20, 2018, cease and desist letter and stated that "there is no formal relationship between Mr. Estes and Copperhead Ag [] at this time," and that "should there be in the future, neither Copperhead Ag [] nor its agents will "spend any time defaming your client." Doc. 15-2.

On July 26, 2018, Don Estes executed an exclusive license agreement ("the License Agreement"), with another Copperhead company, Copperhead Concave Systems, LLC, ("Copperhead Concave") to license among other things, Don Estes's patents and related "technology, know-how, designs, development, prototypes, and information related to the threshing of crops, instrumentation, packaging, and literature." Doc. 20-4; 15-4. Pursuant to the License Agreement, Don Estes granted Copperhead Concave the exclusive right to "make, have made, use, sell, offer for sale, distribute, develop, and create derivative works, improvements, and derivations" from and to the technology any "licensed products". Doc. 20-4; 15-4. "Licensed product" is defined in the License Agreement as "any product covered by or produced using information, know how, or concepts contained within or based upon" the patents owned by Don Estes and includes "further development of the licensed product, any packaging, and any products previously sold by or on behalf of the Seller utilizing the information or concepts contained directly or indirectly within [Don Estes's patents]." Doc. 15-4; 20-4. Don Estes also granted Copperhead Concave the exclusive right and license to use the "licensed marks" in connection with "any making, use, sale, offer for sale, and distribution of any licensed products." Doc. 20-4. Licensed marks is defined as "any of the marks of [licensor, Don Estes] under which [Don Estes] offered or sold any [licensed product] prior to the [e]ffective [d]ate" of the License Agreement. Docs. 15-4; 20-4.

Concurrent with the execution of the License Agreement, Don Estes entered into an exclusive distribution agreement ("the Distribution Agreement") with Copperhead Concave to

distribute "any equipment or devices manufactured for sale using any [of Don Estes's patents,]... packaging, and literature related thereto, and any modifications, improvements, and new generations thereof or thereto." Docs. 15-3; 20-5. Don Estes also granted Copperhead Concave the exclusive right and license to use product marks in connection with the distribution of subject products "including, without limitation, the marks 'RPR CONCLAVE (sic) PATENTS' including any marks previously used relative to the [subject products] except those [marks] over which [Don Estes" has no control." Docs. 15-3; 20-5.

Copperhead Concave markets and sells Don Estes's patented technology pursuant to the Exclusive Licensing Agreement and Exclusive Distribution Agreement. Doc. 1, ¶ 17. Its product is marketed as the "Copperhead Concave System" and correlates with Case International Holland combines and John Deere combines. Docs. 1, ¶ 17; 63-4. In the record are three different advertisements for Copperhead Concave System dated August 17, 2018; September 25, 2018; and October 15, 2018. Doc. 63-4. The September 25, 2018, advertisement states the "Copperhead Concave Systems is proud to manufacture the original RPR Combine System that was designed by Donnie Estes from Frankfurt Indiana. His original design includes a notched round bar, increased space between round bars and adjustable/removable cover plates." Doc. 63-4.

## South Dakota Contacts

KB Ag has no employees, office, distributor, buildings, telephone number, or email address in South Dakota and is not licensed to registered to do business in South Dakota. Doc. 15, ¶ 3.

In mid-August 2017, just prior to KB Ag's formation, Mitchell and Robertson were marketing RPR Concaves on behalf of CM Welding at DakotaFest, held over two days in Mitchell, South Dakota, under the brand name "Estes Performance Concaves," and encouraged attendees to "see us in the Ag Tent – Booth 3304." Doc. 20-12.

At the end of February 2018, KB Ag traveled to and incurred business expenses in South Dakota, although the record is devoid of details as to the purpose of this visit. Doc. 49-1.

On July 23, 2018, KB Ag marketed its XPR Concaves as produced by Estes Performance Concaves in a publication called Dakota Farmer which targets consumers in North and South Dakota. Docs. 49-5; 49-2. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

On July 26, 2018, the annual Ag PhD Field Day event was held in Baltic, South Dakota, and was attended by over 10,000 people with ties to the agricultural community. Doc. 20-8. KB Ag, marketing itself as Estes Performance Concaves, was one of the approximately 28 listed sponsors of Ag PhD Field Day and "Estes Performance Concaves" was listed prominently as a sponsor on the marketing materials involving Ag PhD Field Day. Docs. 20-10; 20-11. It was there, that "Estes Performance Concaves" officially "unveiled" its "new XPR Concaves" and urged attendees to stop by its booth. Doc. 20-9.

In August 21-23, 2018, Defendants attended the DakotaFest Farm Show in Mitchell, South Dakota, which featured agricultural events and activities. Doc. 1, ¶ 37. Although the farm show was in the latter part of August, Defendants incurred business expenses in South Dakota throughout the month of August and a single business expense in South Dakota on September 4, 2018. Doc. 49-1. During the DakotaFest Farm Show, Defendants approached the Copperhead booth and allegedly "began loudly making defamatory statements about Copperhead, its product line, and the ownership group's affiliations with Don Estes." Doc. 1, ¶ 38. Copperhead alleges that Mitchell was visibly upset and creating a scene and that Mitchell's statements could be heard and understood by individual attendees of DakotaFest in and around Copperhead's booth. Doc. 1, ¶¶ 39-40. Copperhead alleges that its personnel asked Mitchell to leave repeatedly and that as she left, she continued to make disparaging, defamatory statements about Copperhead's product that were false and disparaging. Doc. 1, ¶ 41.

The XPR Concave is manufactured in Texas. Doc. 15, ¶ 3. KB Ag takes orders for its XPR Concave through the phone or internet and ships its product from Texas, directly to the customer. Doc. 15, ¶ 3.

The expedited discovery production showed that Defendants have sold at least seven XPR Concaves to customers in South Dakota, grossing more than $48,000 in revenue from these sales. Doc. 49-3. Although one of these sales closed on July 10, 2018, before the field day and farm shows in South Dakota, the other six sales of XPR Concaves to South Dakota customers closed between August 9, 2018, and December 4, 2018—after the field day and farm show events in South Dakota. Doc. 49-3. The record shows the names of the South Dakota customers who purchased the product as well as their phone numbers. Doc. 49-3. Plaintiffs state that

"Defendants' document production does not include communications to and from the South Dakota residents that precipitated that sales" and that "[t]his matter is subject to Plaintiffs' Motion to Compel Production of Documents." Doc. 50. In her declaration, Mitchell states that the majority of KB Ag's sales are not in South Dakota and that the company's in-person marketing efforts are "predominantly" aimed at states with larger numbers of combines, including Iowa and Illinois. Doc. 15, ¶ 4.

Also in the record is a chart "identifying more than 100 individuals who provided e-mail addresses and telephone numbers with South Dakota's '605' area code." Docs. 50 at 3; 49-4.

Continued Marketing of Estes RPR Concave by CM Welding

CM Welding still markets the RPR Concave. On July 2, 2019, Defendants' counsel included in an attachment to his affidavit a copy of what is described as "current" screenshots of CM Welding's website. Doc. 63, ¶ 11; 63-10. Therein, CM Welding is advertising for sale RPR Concaves. It states that "[s]ince 2010 CM Welding has been selling Disrupters and Rotor Bars for John Deere and Case IH combines, then in 2014 CM Welding introduced the RPR Concaves, which were entirely designed to prevent grain loss and keep what you harvest." Doc. 63-10. The "current" CM Welding website also advertises "Estes RPR Concave System for ALL CROPS!." Doc. 63-10. The website also references the "Patented Notch Round Bar" that CM Welding uses "in all our RPR Concave Systems." Doc. 63-10.

Consent to Use "Estes" Name

Don Estes states that he authorized CM Welding to use his name solely for purposes of selling RPR Concaves which incorporated his patented technology. Doc. 21, ¶ 21. Don Estes did not authorize Mitchell and Robertson to use the "Estes" name to help sell products sold by KB Ag or for any other purpose and Don Estes has not been offered compensation for the use of the "Estes" name to promote KB Ag's concave product. Doc. 21, ¶¶ 20-21. Don Estes has repeatedly communicated with Mitchell and Robertson that he objects to the use of the "Estes" name to market and sell KB Ag's concaves. Doc. 21, ¶ 22.

It is alleged that Carolyn Estes, Mitchell's grandmother and guardian, owner of CM Welding, and director of KB Ag, consents to KB Ag's use of the "Estes" name to market its products. Doc. 15, ¶ 10.

**B.    Procedural History**

On August 20, 2018, CM Welding instituted an action in Clinton Superior Court, Indiana. The Court does not have a copy of the initial complaint filed in Clinton Superior Court, but Copperhead stated in its brief that the original complaint accused Copperhead plaintiffs of obtaining "trade secrets" from CM Welding's employees and claimed that Copperhead owed additional money under the August transaction. Doc. 19 at 7.

On September 27, 2018, Copperhead filed a complaint in the Southern Division of the District of South Dakota against KB Ag, Mitchell, and Robertson. Doc. 1. Therein, Copperhead alleges claims for defamation/trade libel; tortious interference; unfair competition; unjust enrichment; deceptive trade practices; unfair competition and false designation of origin under 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and cyberpiracy in violation of 15 U.S.C. § 1125(d). Doc. 1. Plaintiffs also seek a declaratory judgment holding that Defendants "have no right, title or interest in the marks or trade names: 'Estes Concave' and 'Estes Performance Concave,' and that any registered mark obtained by Defendants relating to 'RPR' or including the surname 'Estes' is invalid and unenforceable, and that Plaintiffs, pursuant to the Licensing and Distribution Agreement, are the sole beneficiaries of goodwill, value, and market share that derives from or is affiliated with the patented products and their inventor, [] Don Estes." Doc. 1. Plaintiffs also seek the entry of a preliminary and permanent injunction against Defendants enjoining them "from further infringement and misappropriation of the 'Estes Marks' and/or tradenames; further acts of unfair competition, misappropriation, and unjust infringement; further sales, advertising, or attempts to distribute or sell their products by use, invocation, mention to the 'Estes Marks' and/or tradenames." Doc. 1.

On October 9, 2018, Copperhead filed an opposition to the registration of the "RPR Concaves" trademark by Robertson with the U.S. Patent and Trademark Office. Doc. 58-1. On October 23, 2018, Don Estes filed on opposition to CM Welding's registration of the "RPR" mark in association with agricultural machinery, namely harvesters. Doc. 74.

On October 11, 2018, CM Welding filed an amended complaint against Don Estes, Copperhead Ag, and Copperhead Concave and others in Clinton County, Indiana. Doc. 16-1. In their amended complaint, CM Welding asserted new claims to the ownership of patent rights in

the RPR Concave based on its alleged employment of Don Estes for invention of products, or the shop rights to sell the RPR Concave under common law. Doc. 16-1. CM Welding also claims that it owns the common law rights in the trademark "RPR Concaves." Doc. 16-1. CM Welding seeks to enjoin Copperhead from using the RPR Concaves Trademark. Doc. 16-1.

On October 23, 2018, Copperhead moved for an order permitting substitute service of Defendants in this case. Doc. 5. In support of its motion, Copperhead filed affidavits stating that they attempted to serve, on several occasions, defendant Mitchell, individually and as registered agent for KB Ag, as well as Robertson, but were unsuccessful. Doc. 6. The registered address for KB Ag at the time was a Post Office box. Doc. 7. Attempts to serve Defendants at a Kentucky address listed on a trademark application for KB Ag and at a possible address of Mitchell in Frisco, Texas, were also unsuccessful. Docs. 6, 7. The Court denied Copperhead's motion for an order permitting substitute service on the basis that the substitute service requested by them was not reasonably calculated to give Defendants notice of this lawsuit. Doc. 9. On January 14, 2019, Copperhead filed with the Court a certificate of service issued by the Texas Secretary of State stating that KB Ag was served with a copy of the Complaint and summons in this lawsuit pursuant to Section 5.251 of the Texas Business Organization Code. Doc. 12.

On November 2, 2018, the Clinton Superior Court in Indiana granted Copperhead's motion to stay all proceedings and discovery in that case until it resolved Copperhead's motion to dismiss for lack of personal jurisdiction, motion to dismiss CM Welding's request for declaratory judgment stating that CM Welding owns the common law rights to the RPR Concaves trademark and enjoining Copperhead and Don Estes from using the RPR Concaves trademark, and its motion for Protective Order. Doc. 63-2.

On November 15, 2018, CM Welding filed a motion to dismiss Copperhead's opposition pending with the USPTO pursuant to Rules 12(b)(1), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure and 37 C.F.R. § 2.117. As an exhibit to its motion, CM Welding included a copy of the complaint filed in the Clinton County Superior Court in Indiana. Doc. 58-1.

Sometime in 2018, a lawsuit was filed in United States District Court for the Southern District of Texas by two companies against Don Estes, CSM Corp., Copperhead Concaves, and CM Welding seeking to declare the patents of Don Estes unenforceable and invalid. Doc. 63, ¶ 10; 63-9.

On January 17, 2019, KB Ag moved to dismiss the complaint filed by Copperhead with this Court on the basis of improper venue, lack of personal jurisdiction, and failure to state a claim for relief under Federal Rules of Civil Procedure, 12(b)(3), 12(b)(2), and 12(b)(6), respectively. Docs. 14, 18. Alternative to dismissal, KB Ag moved for an order transferring the case to the Eastern District of Texas pursuant to 28 U.S.C. § 1406(a) and 28 U.S.C. § 1404(a). Docs. 14, 18.

On February 8, 2019, Copperhead filed a motion for permission from the court to conduct expedited discovery for purposes of (1) responding to KB Ag's motion to dismiss for lack of personal jurisdiction and (2) supporting a motion for preliminary injunctive relief which Copperhead also planned to file. Doc. 23. Copperhead supplied the Court with a copy of the written discovery requests (interrogatories and requests for production of documents) it proposed serving on Defendants.

In its brief in support of its motion to conduct discovery, Copperhead explained it wanted to develop information relating to the nature of Carolyn's Estes's relationship with Defendants and relating to whether Carolyn Estes or CM Welding authorized, assigned or otherwise purported to transfer intellectual property rights to defendants relating to RPR Concaves. Doc. 24 at 6-8. Copperhead did not inform the Court in its request for expedited discovery that the Indiana state court had stayed all proceedings and discovery in that action some four months earlier in November 2018.

On February 8, 2019, Copperhead also filed a motion for preliminary injunctive relief and declaratory relief. Doc. 26. Therein, Copperhead requests that the Court enter an order granting the preliminary injunctive and declaratory relief that it seeks in its complaint, specifically: 1) a declaratory judgment that Defendants have no right, title, or interest in the mark "RPR," that any registered mark obtained by Defendants relating to "RPR" or including the surname "Estes" is invalid and unenforceable; 2) entry of a preliminary injunction enjoining Defendants from a) further infringement and misappropriation of the Estes Marks and/or tradenames; b) further acts of unfair competition, misappropriation, and unjust infringement; c) further sales, advertising, or attempts to distribute or sell their products by use, invocation, mention, or reference to the Estes Marks and/or tradenames.

On March 9, 2019, referencing the Indiana state court complaint attached to CM Welding's motion to dismiss Copperhead's opposition to the registration of the RPR Concaves trademark,

the USPTO suspended proceedings pending the conclusion of the civil case in Indiana. Doc. 58-1. There is no indication that the USPTO was aware that the Indiana state court case was stayed in November 2, 2018, pending the court's resolution of Copperhead's motion to dismiss for lack of personal jurisdiction and resolution of other matters pending before the court, nor that it was aware of the existence of this federal district court litigation.

On March 14, 2019, this Court granted Copperhead's expedited discovery request and denied KB Ag's request to transfer the case to the Eastern District of Texas. Doc. 33. Copperhead thereafter served defendants with its written discovery requests. Defendants provided some documents, but not all, and not all electronic documents were provided in the format desired by Copperhead.

On April 5, 2019, counsel of record entered an appearance for defendants Mitchell and Robertson in this case. Docs. 37, 38. On May 21, 2019, Mitchell and Robertson filed a motion to join KB Ag's motion to dismiss. Doc. 42.

On May 29, 2019, after engaging in good faith efforts to resolve their differences on Copperhead's written discovery requests, Copperhead filed a motion to compel discovery. Doc. 43. This motion has been fully briefed by the parties and was referred to Magistrate Judge Veronica Duffy for resolution.

On May 30, 2019, Copperhead filed supplemental briefing in support of its opposition to Defendant's motion to dismiss for failure to state a claim and motion to dismiss for lack of personal jurisdiction in support of its motion for preliminary injunction and declaratory relief. Docs. 49, 50, 51, 53. On June 16, 2019, Defendants filed supplemental briefing in support of their motion to dismiss for failure to state a claim and for lack of personal jurisdiction and on July 2, 2019, Defendants filed a supplemental brief in opposition to Copperhead's motion for preliminary injunctive relief. Docs. 57, 62.

On July 29, 2019, Defendants filed a motion to stay proceedings pending resolution of the case in the Indiana state court which Copperhead has opposed. Docs. 66, 69.

On July 31, 2019, Don Estes withdrew his opposition to CM Welding's registration of the "RPR" mark in association with agricultural machinery, namely harvesters. Doc. 74-2. On

September 10, 2019, the USPTO registered the mark on the Principal Register to CM Welding. Doc. 74.

On September 13, 2019, the Indiana state trial court entered an order denying Copperhead's motion to dismiss or stay, subjecting Copperhead to personal jurisdiction in Indiana and dissolving the previously imposed stay of proceedings. Doc. 75.

## STANDARD OF REVIEW

To withstand a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Evidence, "a plaintiff 'must state sufficient facts in the complaint to support a reasonable inference that [the defendants] can be subjected to jurisdiction within the state.'" *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (alteration in original) (quoting *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)).

To defeat a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a *prima facie* showing of jurisdiction. *Epps v. Stewart Information Services Corp.*, 327 F.3d 642, 647 (8th Cir. 2003). In carrying that burden, the plaintiff's *prima facie* showing is tested through the pleadings as well as affidavits and exhibits presented in opposition to the defendant's motion to dismiss. *Dever*, 380 F.3d at 1072 (quoting *Block Indus.*, 495 F.2d at 260). For purposes of the *prima facie* showing, the evidence, taken as true, is viewed in the light most favorably to the plaintiff. *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991)).

In order to succeed on a motion for a preliminary injunction when there is also a pending challenge to jurisdiction, a plaintiff must prove "at least a reasonable probability of success" on the question of jurisdiction. *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985); *see also Home-Stake Production v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1018 (10th Cir. 1990); *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir. 1990).

While a plaintiff bears the ultimate burden of proof, jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing. *Epps*, 327 F.3d at 647 (citing *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991) (citation omitted)).

# DISCUSSION

## I.    Personal Jurisdiction

Copperhead asserts claims against Defendants for Lanham Act violations and South Dakota state law violations. The Lanham Act does not provide for nationwide service of process, *BE₂ LLC and be₂ Holding A.G. v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) ("The Lanham Act does not authorize nationwide service of process . . . ."), and Defendants are non-residents of the State of South Dakota. When federal claims do not provide for nationwide service of process and defendants do not reside within the forum state, the Court must generally determine (1) whether the forum state's long-arm statute authorizes personal jurisdiction, and (2) if such authorization exists, whether the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *See C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, 626 F.Supp.2d 837 (N.D. Ill. 2009) (citing *Janmark v. Reidy*, 132 F.3d 1200, 1201 (7th Cir. 1997), abrogated on other grounds as recognized in *Advanced Tactical Ordinance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014)); *Tyrrell for Estate of Tyrell v. BNSF Railway Co.*, No. 17-4120, 2018 WL 2944529, at *4 (D.S.D. 2018) (J. Lange) (citing Fed. R. Civ. P. 4(k)(1)).

South Dakota's long-arm statute confers jurisdiction to the fullest extent permissible under the Due Process Clause of the Fourteenth Amendment, so the question here is whether asserting personal jurisdiction over Defendants comports with due process. *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 818 (8th Cir. 1994).

Due process requires "minimum contacts" between a nonresident defendant and the forum state, such that the maintenance of the suit "does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980) (citation omitted). The minimum contact inquiry focuses on whether the defendant purposely availed itself of the privilege of conducting business within the forum State, thus invoking the benefits and protections of its laws. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (citation omitted). This purposeful-availment requirement is met where the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-77 (1985) (citation omitted). A foreign defendant may not be haled into court "solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or a third person." *Id.* at 475

(internal quotations and citations omitted). Even if the defendant has purposely established the necessary "minimum contacts" within the forum State, consideration of "fair play and substantial justice" may nevertheless defeat the reasonableness of jurisdiction. *Id.* at 476.

The Supreme Court has recognized two theories for evaluating personal jurisdiction: general and specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984). "When a cause of action arises out of or is related to a defendant's contacts with the forum state, the exercise of personal jurisdiction is one of specific jurisdiction." *Epps*, 327 F.3d at 648 (citing *Helicopteros Nacionales*, 466 U.S. 408, 414 n.8); *Burger King*, 471 U.S. at 472 (stating that minimum contacts are established if a "defendant has purposely directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to' the activities."). Where the litigation results from alleged injuries that "arise out of or are connected with the [defendant's] activities within the [forum] state," *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 319 (1945), the defendant ordinarily should reasonably anticipate being haled into court in the forum. "Conversely, when the plaintiff's claims do not relate to the defendant's forum-state activities, jurisdiction is likely to be improper since the defendant 'has no reason to expect to be haled before [the forum state's courts]." *Morris v. Barkbuster, Inc.*, 923 F.2d 1277, 1280 (8th Cir. 1991) (alteration in original) (quoting *Toro Co. v. Ballas Liquidating Co*, 572 F.2d 1267, 1271 (8th Cir. 1978)).

"However, if the exercise of jurisdiction does not depend on the relationship between the defendant's contact with the forum state, the exercise of personal jurisdiction is one of general jurisdiction." *Epps*, 327 F.3d at 648 (citing *Helicopteros Nacionales*, 466 U.S. at 415 n.9). When general jurisdiction is in question, a defendant may be subject to the forum state's exercise of personal jurisdiction if contacts with the state are continuous and systematic." *Id.* (citing *Helicopteros Nacionales*, 466 U.S. at 414).

Copperhead concedes that general jurisdiction is lacking in this case. The Court will therefore focus its analysis on whether it has specific jurisdiction over Defendants in this case.

### A. "Arise out of or relate to"

"[T]he Supreme Court has not yet explained the scope of [the arise out of or relate to] requirement." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 912 (8th Cir. 2012) (citing *O'Connor*

*v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 318 (3d Cir. 2007)). In *Myers v. Casino Queen, Inc.*, 689 F.3d 904 (8th Cir. 2012), the Eighth Circuit Court of Appeals stated that it has not adopted a specific standard interpreting the "arise out of or relate to" requirement, and noted that in past cases, it has focused on "the need to adopt a flexible approach when construing the 'relate to' aspect of the Supreme Court's standard[,]" emphasizing the "need to consider 'the totality of the circumstances in deciding whether personal jurisdiction exists.'" *Id.* at 912-13 (quoting *K-V Pharm Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592-93 (8th Cir. 2011)).

## B. Minimum Contacts

"Minimum contacts looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly relevant conduct. *Id.* (internal citations omitted).

A defendant's minimum contacts with the forum state must exist prior to the filing of the lawsuit. *See Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (citing *Clune v. Alimak AB*, 233 F.3d 538, 544 n.8 (8th Cir. 2000) ("Minimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit.")). In addition, "[b]ecause specific jurisdiction requires a nexus between the defendant's contacts with the forum state and the subject matter of [the] claims in this litigation," the Court must ensure that Defendants' contacts with South Dakota are sufficiently related to each of the causes of action pleaded by Copperhead in this case. *See Zumbro, Inc. v. Cal. Natural Prods.*, 861 F.Supp. 773, 779 (D. Minn. 1994) (citing *Barkbuster*, 923 F.2d at 1281-82); *see also Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006) ("Permitting the legitimate exercise of specific jurisdiction over one claim to justify the exercise of specific jurisdiction over a different claim that does not arise out of or relate to the defendant's forum contacts would violate the Due Process Clause.").

In the Eighth Circuit, courts employ a five-factor test to determine the sufficiency of a defendant's contacts with the forum state: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relationship of the cause of action to the contacts; and to a lesser degree, (4) the interest of [the forum state] in providing a forum for

its residents; and (5) the convenience or inconvenience of the parties. *Burlington Industries, Inc. v. Maples Industries, Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996) (citing *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983)). The third factor distinguishes between specific jurisdiction and general jurisdiction. *Myers*, 689 F.3d 904 at 911. The last two factors are considered less important and are not determinative. *Precision Const. Co. v. J.A. Slattery Co., Inc.*, 765 F.2d 114, 118 (8th Cir. 1985).

In addition to the five factors discussed above, given that Copperhead's claims involve intentional torts, the Court may consider whether a defendant's intentional acts were performed "for the very purpose of having their consequences felt in the forum state." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390-91 (8th Cir. 1991) (applying *Calder* effects test in determining personal jurisdiction over trademark infringement claim); *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010). This is known as the "effects test" and it was first employed by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). The "effects" test provides that

> a defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered-and which the defendant knew was likely to be suffered-[in the forum state].

*Johnson*, 614 F.3d at 796 (quoting *Lindgren v. GDT, LLC*, 312 F.Supp.2d 1125, 1132 (S.D. Iowa 2004) (internal quotations and citation omitted)).

"In relying on *Calder*, [the court] do[es] not abandon the five-part test . . . . [Rather], *Calder* requires the consideration of additional factors when an intentional tort is alleged." *Dakota Indus. Inc.*, 946 F.2d at 1391; *Walden*, 571 U.S. at 290 ("*Calder* made clear that mere injury to a forum resident is not sufficient connection to the forum. . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."); *Hylland v. Flaum*, Civ. No. 16-4060, 2016 WL 6901267 (D.S.D. Nov. 11, 2016) (J. Lange) ("Although the effects test does not replace the five factors the Eighth Circuit traditionally uses to evaluate personal jurisdiction, the effects test is one way to evaluate at least the first three factors.") (citing *Estate of Witko v. Hornell Brewing Co.*, 156 F.Supp.2d 1092, 1101 (D.S.D. 2001); *Sturgis Area Chamber of Commerce v. Little Sturgis Rally & Races for Charity, Inc.*, Civ. No. 08-5024, 2008 WL 9358654, at *7-9 (D.S.D. Dec. 19, 2008)).

*1. Summary of South Dakota Contacts*

The Court recognizes that Copperhead is still seeking discovery on communications that Defendants may have had with South Dakota customers and that such discovery is the subject of their motion to compel. However, even without this evidence, the Court concludes that it has specific jurisdiction over Defendants for each of the claims alleged in Copperhead's complaint.

KB Ag is organized in Texas and its principal place of business is in Texas. KB Ag is not licensed to do business in South Dakota. In addition, KB Ag has no employees or agents in South Dakota, nor owns or leases and real or personal property here. KB Ag takes orders for its XPR Concaves through the phone or internet and ships its product from Texas, directly to the customer.

That being said, the nature and quality of Defendants' other contacts with South Dakota are significant and are related to the claims in this case.

In August 2017, Robertson and Mitchell appeared at DakotaFest, a two-day agricultural event in Mitchell, South Dakota. This event took place one month prior to Robertson and Mitchell incorporating KB Ag while Mitchell was still working for CM Welding. At DakotaFest, Robertson and Mitchell marketed RPR Concaves under the brand name "Estes Performance Concaves" and encouraged attendees to visit its booth.

The next year, on July 26, 2018, KB Ag attended the annual Ag PhD Field Day event in Baltic, South Dakota. This event was attended by over 10,000 people with ties to the agricultural community. At the Field Day event, KB Ag, marketing itself as Estes Performance Concaves, was one of the approximately 28 listed sponsors of Ag PhD Field Day and "Estes Performance Concaves" was listed prominently as a sponsor on the marketing materials involving Ag PhD Field Day. There, "Estes Performance Concaves" "unveiled" its "new XPR Concaves" and urged attendees to stop by its booth.

Throughout the month of August 2018, Defendants incurred expenses in South Dakota and on August 21-23, 2018, Mitchell and Robertson again attended DakotaFest in Mitchell, South Dakota, but were marketing "Estes Performance Concaves" on behalf of KB Ag, rather than CM Welding. There is no evidence in the record showing that in South Dakota, Defendants ever distinguished that their XPR Concaves were produced and sold by an entirely different company.

It was at DakotaFest when Defendants allegedly approached the Copperhead booth and "began loudly making defamatory statement about Copperhead, its product line, and the ownership group's affiliations with Don Estes." By that time, Defendants were aware of a relationship between Don Estes and Copperhead. They had already sent Copperhead and Don Estes, "as a representative and agent for Copperhead" a cease and desist letter and Copperhead had already begun to market its new Copperhead Concave System.

The Court notes some other South Dakota contacts that are relevant to its personal jurisdiction determination, but are of less significance. The expedited discovery production showed that on July 23, 2018, KB Ag marketed its XPR Concaves under the brand name Estes Performance Concaves in a publication called Dakota Farmer which targets consumers in North and South Dakota[1]. In addition, Defendants have sold at least seven XPR Concaves to customers in South Dakota, grossing more than $48,000 in revenue from these sales. Although one of these sales closed on July 10, 2018, before the Ag PhD Field Day and DakotaFest farm shows in South Dakota, the other six sales of XPR Concaves to South Dakota customers closed between August 9, 2018, and December 4, 2018—after Defendants showcased their new XPR Concaves under the "Estes Performance Concaves" brand in South Dakota. The record shows the names of the South Dakota customers who purchased the XPR Concaves from Defendants as well as their phone numbers, however, it is unclear whether South Dakota consumers had purchased their products on the website or over the phone. Copperhead states that "Defendants' document production does not include communications to and from the South Dakota residents that precipitated that sales" and that "[t]his matter is subject to Plaintiffs' Motion to Compel Production of Documents." █

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████. Additionally, Defendants' contacts in other state do not

---

[1] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████

deprive this Court of jurisdiction over claims arising out of contacts Defendants have with this forum.

2. *Forum Contacts: Defamation/Trade Libel; Tortious Interference; Unfair Competition; Unjust Enrichment; Deceptive Trade Practice Act; Unfair Competition and False Designation of Origin under § 43(a) of the Lanham Act*

In 2017, Robertson and Mitchell were in Mitchell, South Dakota, marketing their RPR Concaves for CM Welding under the Estes Performance Concaves brand. The next year, they returned to South Dakota on two different occasions to market an entirely different product under the Estes Performance Concaves brand which they had just introduced into the wider market. On one of the occasions, Defendants were in South Dakota for approximately an entire month. These actions and the resulting confusion that is alleged to have resulted in the marketplace as to the source of Defendant's products give rise to Copperhead's unfair competition and deceptive trade practices claims.

Moreover, the Court finds that Defendants attempted to profit from the confusion resulting from their purposeful acts directed at the forum state. The expedited discovery production shows that as of May 30, 2019, Defendants grossed approximately $48,000 from sales to South Dakota consumers. All but one of these consumers had purchased their XPR Concave in the fall or winter after Defendants' marketing efforts at the farm shows and presence in the State. While the record does not show whether or not South Dakota consumers who purchased the XPR Concaves were actually confused, Plaintiff need only prove a likelihood of confusion to succeed on their unfair competition claims.

3. *Forum Contacts: Defamation/Trade Libel*

The Court concludes that it has personal jurisdiction over Defendants with regard to the defamation/trade libel claim. Defendants' intentional and alleged tortious actions were conducted in the forum state and Defendants knew that the brunt of the injury would be felt by Copperhead in South Dakota, the State in which it is domiciled. Just a month prior to DakotaFest 2018, Defendants acknowledged that Don Estes and Copperhead had entered into a formal relationship and by that time, Copperhead had already begun marketing its Copperhead Concave System.

4. *Forum Contacts: Cyberpiracy under Section 43(a) of the Lanham Act*

Copperhead alleges that Defendants have "registered, trafficked in, and used the domain names" "estesperformanceconcaves.com" and that the domain name is confusingly similar to and dilutive of Don Estes's personal name. Copperhead is seeking an order from the Court requiring the forfeiture or cancellation of the domain name or, alternatively, transfer of the same.

In evaluating a defendant's website contacts with the forum, the appropriate analytical framework is that of *Zippo Manuf. Co. v. Zippo Dot Com. Inc.*, 952 F.Supp. 1119 (W.D. Pa. 1997). *See Lakin v. Prudential Securities, Inc.*, 348 F.3d 704, 710-12 (8th Cir. 2003) (finding the *Zippo* test appropriate for specific jurisdiction cases). The *Zippo* court observed that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of the commercial activity that an entity conducts over the Internet." *Zippo*, 952 F.Supp. at 1124. The court employed a "sliding scale" to measure the nature and quality of the commercial activity central to its personal jurisdiction analysis. It noted:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* (citations omitted).

The Court finds that the website in this case is commercial in nature and highly interactive. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████. "A website that is not specifically directed at the forum and is available to customers throughout the country cannot, standing, alone, establish personal jurisdiction over the website owner[/user]." *Whatru Holding, LLC v. Bouncing Angels, Inc.*, Civ. No. 13-2745, 2014 WL 641517 (D. Minn. Feb. 19, 2014) (citing *Campbell Pet Co. v. Miale*, 542 F.3d 879, 884 (Fed. Cir. 2008)).

24

Overall, the Court concludes that given the high interactivity of the website, and the other contacts Defendants had with the forum State, Defendants have sufficient minimum contacts within South Dakota such that exercise of personal jurisdiction over Defendants with regard to this claim would not offend traditional notions of fair play and substantial justice.

### 5. *Forum Contacts: Individual Defendants Robertson and Mitchell*

Defendants argue that the Court lacks jurisdiction over Robertson and Mitchell in their individual capacities because any contacts with South Dakota, the forum State, are contacts by KB Ag. "The fiduciary shield doctrine protects individuals from being subject to jurisdiction solely on the basis of their employers' minimum contacts within a given jurisdiction." *Allstar Marketing Group, LLC v. Your Store Online, LLC*, 666 F.Supp.2d 1109, 1119 (C.D. Cal. 2009). However, the fact that Robertson and Mitchell took actions constituting sufficient contacts with the state on behalf of a corporate employer, will not shield them from being subjected to jurisdiction. *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction.). "Each defendant's contacts with the forum State must be assessed individually." *Id.*

While the contacts of a corporate officer taken on behalf of the corporation will generally not subject the officer to jurisdiction in the forum state in his individual capacity, courts recognize an exception to the "fiduciary shield doctrine" for a corporate officer's intentional tortious or fraudulent actions. *Se Larson Mfg. Co. of S.D., Inc. v. Connecticut Greenstar, Inc.*, 929 F.Supp.2d 924, 930 (D.S.D. 2013) (J. Piersol).

The complaint alleges various types of intentional torts against Defendants. Because Robertson and Mitchell were primary participants in the alleged wrongdoing, *see Calder*, 465 U.S. at 790, the Court concludes that the fiduciary-shield doctrine is not applicable in this case. Based on the totality of the circumstances and the relationship among Mitchell, Robertson, KB Ag, the forum, and the litigation, Defendants' motion to dismiss claims against Mitchell and Robertson in their individual capacities for lack of personal jurisdiction is denied.

### C. Fair Play and Substantial Justice

The Court concludes that Defendants have purposely established the necessary "minimum contacts" within the forum State and must now consider whether the exercise of jurisdiction would comport with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-77 (1985). The forum certainly has an interest in providing a forum for its residents. Although it would be inconvenient for Defendants to litigate in a foreign forum, the Court concludes that it is in the interests of justice to resolve this dispute, especially given the significant amount of time and money the parties have already put forth in litigating this matter.

For the foregoing reasons, the Court concludes that it has personal jurisdiction over Defendants in this matter.

## II.     Motion for Preliminary Injunctive Relief and Declaratory Relief

Pending before the Court is Copperhead's motion for preliminary and injunctive relief. Doc. 26. Therein, Copperhead requests that the Court enter an order granting the preliminary injunctive and declaratory relief sought in the complaint, specifically: 1) a declaratory judgment that Defendants have no right, title, or interest in the mark "RPR," that any registered mark obtained by Defendants relating to "RPR" or including the surname "Estes" is invalid and unenforceable; 2) entry of a preliminary injunction enjoining Defendants from further infringement and misappropriation of the Estes marks and/or tradenames; further acts of unfair competition, misappropriation, and unjust infringement; further sales, advertising, or attempts to distribute or sell their products by use, invocation, mention, or reference to the Estes marks and/or tradenames.

In determining whether to grant preliminary injunctive relief, the four factors the Court considers are: "'(1) the threat of irreparable harm to the movant; (2) the state of balance between the harm and the injury that granting the injunction will inflict on other part[y] litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). The Eighth Circuit Court of Appeals has "observed that the 'likelihood of success on the merits is most significant.'" *Id.* (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012)). "The burden on a movant to demonstrate that a preliminary injunction is warranted is heavier when, as here, granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a

trial on the merits." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (citing 2 J. McCarthy, *Trademarks and Unfair Competition* § 482 (1984)).

## A. Court's Jurisdiction over Lanham Act Claims

In the present case, Copperhead requests not only a declaratory judgment seeking cancellation of the trademarks "Estes Concaves" and "Estes Performance Concaves," it also requests a preliminary and permanent injunction enjoining Defendants from using, invoking, mentioning, or referencing the "Estes" marks and/or tradename; and a judgment in their favor on their claims for defamation/trade libel, tortious interference, unfair competition, unjust enrichment, deceptive trade practices, unfair competition and cyberpiracy under § 43(a) of the Lanham Act; and associated damages[2], in an amount to be proven at trial.

The Lanham Act allows for cancellation of trademark registrations by one who "believes that he is or will be damaged by the registration." 15 U.S.C. § 1064. 15 U.S.C. § 1064, relates only to administrative Trademark Board proceedings in the Patent and Trademark Office. It does not authorize suits for cancellation in a federal district court. District court jurisdiction requires that there be some basis beyond the mere fact that the parties are competitors and plaintiff wants to use the term which is registered as a mark. J. T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 30:110, 30-302 (4th ed.) ("McCarthy"); *Pogrebnoy v. Russian Newspaper Dist., Inc.*, 289 F.Supp.3d 1061, 1071 (C.D. Cal. 2017) (stating that 15 U.S.C. § 1052(d) and 15 U.S.C. § 1054 only apply to cancellation proceedings before the USPTO).

If a petition for cancellation of a federally registered mark is the sole basis of a plaintiff's claim for declaratory judgment in the federal courts, the court should dismiss the case and relegate the party to the administrative process of a petition to cancel before the Trademark Board. McCarthy, § 30:112, 30-303. This is the procedure set up by Congress and a party should not be allowed to short-circuit the primary jurisdiction of the USPTO Trademark Board by seeking direct relief in federal courts. *Id.*; *see also, Pogrebnoy*, 289 F.Supp.3d at 1071. "[O]ne seeking cancellation offensively and relying solely on that claim for federal jurisdiction would seem to be relegated to first exhausting his administrative remedies before resorting to the courts." *Universal Sewing Mach. Co. v. Standard Sewing Equip. Corp.*, 185 F.Supp. 257, 260 (S.D.N.Y. 1960). If,

---

[2] 15 U.S.C. § 1117 provides that a plaintiff who prevails under § 1125(a) or (d) shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

however, "the declaratory plaintiff presents issues of infringement of the federally registered mark which cannot be heard by the administrative tribunal of limited powers, judicial efficiency requires that a federal court hear all those claims in one case, even though some of these claims might be within the primary jurisdiction of the Trademark Board." McCarthy, § 30:110, 30-303.

In the present case, the relief that Copperhead seeks is beyond that the Trademark Board's jurisdiction to award. 15 U.S.C. § 1117 permits courts, not the Trademark Board, to award defendant's profits, damages sustained by a plaintiff, and costs of the action to plaintiffs who prevail on a claim arising under 15 U.S.C. § 1125(a) (false association/origin), or (d) (cyberpiracy). Additionally, the Trademark Board is without authority to enjoin Defendants from using the "Estes" mark as Copperhead seeks to do in this case. For these reasons, Copperhead was not required to first exhaust their administrative remedies with regard to the relief it seeks before filing in federal court.

### B. False Association Claim

Copperhead appears to allege that Defendants use and invocation of the Estes marks in the advertising and marketing of XPR Concaves falsely implies the sponsorship, affiliation, or approval of the product by Don Estes in violation of § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). In their complaint, Copperhead alleges that Don Estes "has become a well-known indicator of quality and innovative technology in the relevant agricultural product marketplace, and has acquired substantial secondary meaning therein." Doc. 1, ¶ 77. Copperhead further alleges that it "ha[s] paid, and will continue to pay, consideration to Mr. Estes for the exclusive rights to license and distribute his patents and to market its products accordingly" and unless enjoined, Defendants "will continue to cause substantial and irreparable injury to [Copperhead]" by usurping the "good will and reputation that constitute part of the consideration underlying [Copperhead's] contractual relationship with Mr. Estes." Doc. 1, ¶¶ 76, 79, 80. In their motion for preliminary injunction, Copperhead expounds on the harm that it has suffered as a result of Defendants' allegedly wrongful conduct as follows:

> The harm suffered has negatively impacted and will continue to negatively impact Plaintiffs' ability to establish a brand in the marketplace, to compete for larger market share, and to gain from its direct connection to and partnership with Don Estes, a well-known, well-respected innovator and entrepreneur in the agricultural machinery industry.

Doc. 26 at 2.

Section 43(a) of the Lanham Act provides that:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).

"False endorsement occurs when a person's identity is connected with a product or service in such a way that consumers are likely to be misled about that person's sponsorship or approval of the product or service." *Stayart v. Yahoo! Inc.*, 651 F.Supp.2d 873, 880 (E.D. Wis. 2009) (citing *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 025-26 (6th Cir. 2003)); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (3d Cir. 1979).

The Eighth Circuit Court of Appeals has characterized a false endorsement claim under § 43(a)(1)(A) of the Lanham Act, as "false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive[3] mark, name, trade dress, or other device." *White Hall Pharmacy LLC d/b/a/ Doctor's Orders d/b/a/ Doctor's Orders Pharmacy v. Doctor's Orders RX Inc.*, Civ. No. 19-0366, 2019 WL 3939357, *20 (E.D. Ark. Aug. 20, 2019) (quoting *Dryer v. Nat'l Football League*, 814 F.3d 938, 944 (8th Cir. 2016), *appeal docketed*, No. 19-2840 (8th Cir. Aug. 27, 2019)). In order to prove a false endorsement

---

[3] The Court notes that § 43(a)(1)(A) does not explicitly require the "word, terms, name, symbol, or device" to be "distinctive," but "courts have universally imposed the requirement, since without distinctiveness the [mark] would not cause 'confusion . . . as to the origin, sponsorship, or approval of [the] goods,' as the section requires." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000).

claim under § 43(a)(1)(A) of the Lanham Act, "a plaintiff must provide evidence that the challenged statements are either 'literally false as a factual matter' or 'literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or [are] likely to deceive consumers.'" *Id.* (quoting *Dryer*, 914 F.3d at 944 (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)).

False endorsement cases can be analyzed under the false association prong of § 43(a)(1)(A) or within the false advertising prong of § 43(a)(1)(B), McCarthy § 28:15, 28-27, and the standards under which courts analyze claims arising under (a)(1)(A) and (a)(1)(B) are different, 542 F.3d 1007, 1021 (3d Cir. 2008). In the Eighth Circuit, absent evidence of a bad faith intent to deceive, a plaintiff must provide proof of actual confusion in order to prevail on a claim for false advertising under (a)(1)(B) based on allegation that a commercial claim is misleading in context, as opposed to literally false. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1182-83 (8th Cir. 1998). By contrast, a plaintiff bringing a claim for false endorsement under (a)(1)(A) need only prove that the representations are "likely to cause confusion . . . as to the origin, sponsorship, or approval of [Defendant's] goods, services, or commercial activities by [Don Estes]." *See* 15 U.S.C. § 1125(a)(1)(A); *see also Dryer*, 814 F.3d at 944 (8th Cir. 2016); *White Hall Pharmacy,* 2019 WL 3939357, at *8-10, *20 (applying actual confusion test to false advertising claim under (a)(1)(B) and likelihood of confusion test to false endorsement claim under (a)(1)(A)); *Infogroup, Inc. v. Database LLC*, 95 F.Supp.3d 1170, 1188-92 (D. Neb. 2015) (same). As noted by the Third Circuit in *Facenda*, "[t]he statutory text of the two subsections differs; only subsection (a)(1)(A) includes the phrase 'likely to cause confusion.'" 542 F.3d at 1021.

Here, Copperhead brings its claims under the § 43(a)(1)(A) false association prong of the Lanham Act. Because the allegations in the complaint do not support a finding that Defendants made a literally false statement that Don Estes endorses XPR Concaves, Copperhead must prove that the wrongful use of the Estes mark or name in Defendant's advertising and domain name is likely to mislead consumers into believing Don Estes is associated with or endorses the XPR Concave.

### 1. Likelihood of Confusion

The Eighth Circuit evaluates the following non-exclusive factors in assessing whether a likelihood of confusion exists under § 43(a)(1)(A):

(1) the strength of the trademark; (2) the similarity between the parties' marks; (3) the degree of competition between the products; (4) the alleged infringer's intent to confuse; (5) evidence of actual confusion; and, (6) the degree of care reasonably expected of potential customers.

*Anheuser-Busch, Inc. v. Balduccci Pubs.*, 28 F.3d 769, 774 (8th Cir. 1994); *Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759-60 (8th Cir. 2005). "These factors do not operate in a mathematically precise formula; rather, we use them . . . as a guide to determine whether a reasonable jury could find a likelihood of confusion." *Duluth News-Tribune, a Div. of N.W. Pubs., Inc. v. Mesabi Publish. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996).

The Third Circuit Court of Appeals noted that factors such as it[4] employs, which this Court finds to be similar to the factors courts in the Eighth Circuit apply to determine "likelihood of confusion," while well-suited to cases involving a name or mark identifying a particular product, are less well-suited to a false endorsement case that protects a person's name or identity as a mark. *Facenda*, 542 F.3d at 1019. The court in *Facenda* tailored the factors to a false endorsement claim as follows:

1. the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended;
2. the relatedness of the fame or success of the plaintiff to the defendant's product;
3. the similarity of the likeness used by the defendant to the actual plaintiff;
4. evidence of actual confusion and the length of time the defendant employed the allegedly infringing work before any evidence of actual confusion arose;
5. marketing channels use;
6. likely degree of purchaser care;

---

[4] The Third Circuit Court of Appeals applies the following ten factors in evaluating the likelihood of confusion between marks of two competing or non-competing goods:

(1) The degree of similarity between the owner's mark and the alleged infringing mark;
(2) The strength of the owner's mark;
(3) The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) The length of time the defendant has used the mark without evidence of actual confusion arising;
(5) The intent of the defendant in adopting the mark;
(6) The evidence of actual confusion;
(7) Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
(8) The extent to which the targets of the parties' sales efforts are the same;
(9) The relationship of the goods in the minds of the consumers, whether because of the near-identity of the products; the similarity of function, or other factors; [and]
(10) Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expend into the defendant's market.

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000).

7. defendant's intent [in] selecting the plaintiff; and
8. likelihood of expansion of the product lines.

542 F.3d at 1119-20.

The Court will apply the six-factor test used in this circuit to evaluating the likelihood of confusion that exists by Defendants' use of the Estes name in their website and marketing materials, keeping in mind, as the Third Circuit Court of Appeals did in *Facenda*, that this is a false endorsement claim.

### a. Strength of Mark

"A strong and distinctive trademark is entitled to greater protection than a weak or common place one." *Frosty Treats v. Sony Computer Entertainment Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005). "In a traditional trademark case, the relative strength of a trademark is determined by placing the mark into one of the five categories of increasing distinctiveness and, hence, strength: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Amazon Inc. v. Cannondale Inc.*, Civ. No. 99-571, 2000 WL 1800639, *8 (D. Colo. 2000) (citation omitted); *Co-Rect Products v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985).

This case differs from the traditional trademark infringement case because Copperhead is asserting a false endorsement claim. *See Amazon Inc.*, 2000 WL 1800639, at *8. Nevertheless, the rule that greater protection is afforded to more distinctive marks is still applicable. *Id.* Generally, names are treated like descriptive marks in a traditional trademark infringement action. *Id.* (citing *Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988) (quoting *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495 (2d Cir. 1962)). Descriptive marks are protective only if they have acquired a "secondary meaning." *Id.*; *see also Co-Rect Products*, 780 F.2d at 1329. A mark has acquired secondary meaning when "by long and exclusive use in the sale of the user's good, the mark has become so associated in the public mind with such goods that the mark services to identify the source of the goods and distinguish them from those of others." *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 323 (8th Cir. 2018). In the present context, the secondary meaning inquiry considers whether the purported endorser possesses some baseline level of public recognition. *See Amazon Inc.*, 2000 WL 1800639, at *8; *White v. Samsung Electronics Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992) ("The 'strength' of the mark refers to the level of recognition the celebrity enjoys among members of society.").

"While many [false endorsement] cases arise in the context of a popular celebrity, some cases [as well as a leading treatise have stated] that popularity or celebrity status is not a necessary prerequisite for a successful false endorsement claim under the Lanham Act" with regard to use of a noncelebrity's name. *Stayart v. Yahoo!Inc.*, 651 F.Supp.2d 873, 881 (E.D. Wis. 2009); *see also White Hall Pharmacy*, 2019 WL 3939357 at *20; *Hauf v. Life Extension Found.*, 547 F.Supp.2d 771, 777 (W.D. Mich. 2008); *Ji v. Bose Corp.*, 538 F.Supp.2d 349, 351 (D. Mass. 2008); *Doe v. Friendfinder Network, Inc.*, 540 F.Supp.2d 288, 306 (D.N.H. 2008); McCarthy § 28:15.50, 28-43. As evident from the first factor employed by the court in *Facenda*—the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended— a high level of recognition in a niche industry may provide a purported endorser with a claim for false endorsement. See McCarthy, § 28:15.50, 28-44 (stating that a reputation in a small, niche market may be able to demonstrative commercial value).

In *Hauf v. Life Extension Foundation*, 547 F.Supp.2d 771, 775 (W.D. Mich. 2008), the district court permitted plaintiffs, who were well-known among cancer patients and advocates to bring a false endorsement/false association claim against a company under § 43(a) of the Lanham Act. When Barrow was diagnosed with brain cancer in 1991, his mother (Hauf) brought him to Mexico to begin Immune Augmentative Therapy. *Id.* Hauf also gave Barrow shark cartilage supplements and in 1992, Barrow's MRI's showed a shrinkage of the tumor in his brain. *Id.* Some of the shark cartilage supplements were purchased from the defendant non-profit and by 1994, Barrow was considered to be "fully recovered." *Id.* Hauf and Barrow's story had begun to gain widespread attention through local, regional and national media and defendant and since Barrow's recovery, Hauf alleged that she "devoted her life to helping those afflicted with cancer and other disease," traveling throughout the country to speak to groups and granting interviews to widely read publications." *Id.*

In early September 2005, the defendant nonprofit mailed out membership drive campaign materials, seeking new members and donations. *Id.* The membership drive materials included a two-page testimonial attributed to plaintiffs and included a photograph meant to represent Hauf. *Id.* The district court declined to dismiss the plaintiff's false endorsement claim. *Id.* at 777. The court held that "Barrow may be able to demonstrate a notoriety among cancer patients or advocates of alternative medicine that is strong enough to have commercial value within the identifiable group" and that plaintiffs would be permitted to try and prove "facts in support of [his] claim that

the membership drive materials misled the public about his sponsorship or approval of [the defendant non-profit's] activities and products." *Id.*

In this case, there is no question that Don Estes has established a commercial interest in his name and reputation in the agricultural products industry.[5] That being said, as discusse din more detail below, the Court questions whether the "Estes" name still retains significance as a source-identifying mark.

There are different ways a name may lose its significance as a source-identifying mark. For example, "[p]ervasive unauthorized use of a celebrity's persona will tend to dull the popular perception that use of that persona signifies an endorsement at all." *Cairns v. Franklin Mint Co.*, 107 F.Supp.2d 1212, 1217 (C.D. Cal. 2000) ("*Cairns I*") (quoting *Lord Simon Cairns et al. v. Franklin Mint*, 24 F.Supp.2d 1013, 1039 (C.D. Cal. 1998)). In *Cairns I*, the court found that because the image of Princess Diana had been associated with a "vast inventory of products sold by innumerable sources," the image of Princes Diana on a product provided consumers with no suggestion that the product was associated with her. *Id.* at 1217. The court founds that "[h]er image had truly lost any significance as a mark identifying the source of the product." *Id.*

This case is certainly distinguishable from the facts in *Cairns I* in that there is no evidence that Don Estes's name became a generic name for goods and service. However, a name can lose its significance as a source-identifying mark also through an assignment of the rights to the name. In *The Martha Graham School & Dance Found., Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 153 F.Supp.2d 512 (S.D.N.Y. 2001), a registrant of the service marks "Martha Graham" and "Martha Graham Techniques," used in connection with dance instruction, brought a trademark infringement action against a dance foundation and school. Defendants raised as a defense that they were prior users of the name Martha Graham in connection with their respective educational institutions. *Id.* at 525. In 1948, Martha Graham and several of her supporters incorporated the Martha Graham Foundation for Contemporary Dance, Inc. which in 1968, was changed to the Martha Graham Center of Contemporary Dance, Inc. *Id.* at 515. The Foundation's Certificate of Incorporation included a sworn statement by Graham that she "hereby consents to

---

[5] Defendants state that the Estes name was used to identify Carolyn Estes and that she gave Defendant's consent to use her name. The Court concludes that a reasonable juror could find that the public identified the Estes name with Don Estes as opposed to Carolyn Estes. It was Don Estes whose name and persona was used to market the Disrupter and the RPR Concaves and Carolyn's Estes's name never appeared on CM Welding's website or in any marketing materials.

the use of her name in said corporate title." *Id.* at 525. The plaintiffs argued that Graham's consent accompanying the Certificate of Incorporation was a limited license from Graham to the Center permitting the use of her name, and that Graham, as licensor, retained the right to revoke the Center's use of her name. *Id.* at 525.

The court in *The Martha Graham School* held that Graham's consent was an irrevocable assignment of the right to use her name in the Center's title and that by virtue of the assignment, Defendants became the senior user of the mark. *Id.* at 526. The court stated that there was no evidence that Graham was paid a licensing fee for the use of her name during her life which would suggest that her consent was revocable. *Id.* Additionally, the Court found that the evidence suggested that Graham understood her consent to be an irrevocable assignment to the Center. *Id.* Finally, the court noted that Graham benefitted from the assignment to the Center because the Center was created to raise money to promote the Martha Graham technique and to fund the performances of the Marth Graham Dance Company. *Id.*

In the present case, there is no evidence in the record of any written consent by Don Estes to CM Welding to use his name. However, Don Estes stated that he consented to the use of his name by CM Welding in its marketing efforts because he was married to the owner, Carolyn Estes. Consent may also be implied from the facts in the case. On CM Welding's website was an announcement that Don Estes retired and that it was taking on all of his products. CM Welding began advertising the RPR Concave as the Estes Disrupter Kit and eventually Estes Performance Concaves. Don Estes benefitted from this arrangement in that he received distributions from the CM Welding into a joint account that he owned with Carolyn Estes. Don Estes's consent to use his name in the marketing of the RPR Concave on behalf of CM Welding resulted in his name acquiring secondary meaning to distinguish CM Welding's RPR Concave from concaves produced by other companies and accordingly, the Court questions whether Don Estes's name lost is source-identifying function.

In *Jako v. Pilling Co.*, 670 F.Supp. 1074 (D. Mass. 1987), vacated in part on other grounds, 848 F.2d 318 (1st Cir. 1988), a physician, Dr. Jako, had in 1963, suggested modifications to the defendant company's laryngoscope. *Id.* at 1076. Following industry practice, after implementing the physician's modifications, the instruments were marketed, with Dr. Jako's consent, as the "Jako laryngoscope." *Id.* Dr. Jako brought a lawsuit requesting an injunction enjoining the defendant from continuing to use the name "Jako" in any way or otherwise implying

a relationship with the plaintiff in the course of business. *Id.* at 1077. The court evaluated the following factors in determining whether the name had acquired secondary meaning: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made to promote a conscious connection in the public's mind between the name and the holder's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product. *Id.* The court held that the surname "Jako" had acquired a secondary meaning and that the plaintiff could not reappropriate his surname for his exclusive use once it had acquired its secondary meaning. *Id.*; *see also* McCarthy, § 13:2, 13-10 ("It has been held that a person who acquiesces in the use of his name by another is estopped years later from claiming the name as a proprietary trademark.") (citing *Jako*, 670 F.Supp. 1074).

As stated above, CM Welding began advertising the RPR Concaves under the name "Estes" as early as 2013. The company, and eventually, KB Ag, on behalf of CM Welding, have spent time and money continuing to market the RPR Concave under the name Estes Concaves or Estes Performance Concaves. The evidence in the record shows that the persons in the industry identify the "Estes" name with RPR Concaves produced by CM Welding.

"Secondary meaning does not require proof that consumers know the name of the company that owns the trademark." McCarthy, § 15:1, 15-6. "[F]ew buyers know, or care about, the corporate identity of the seller of a trademarked product." McCarthy § 15:8, 15-21; 15 U.S.C. § 1127 (defining a "trademark" as a mark used "to identify and distinguish [a person's] goods, including a unique product, from those manufacturer or sold by others and to indicate the source of the goods, even if that source is unknown"); *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 333 (2d Cir. 1983) (in a case of a toy spin-off of a TV series, it is sufficient to prove secondary meaning by proof that buyers identified the toy with the TV series; it is not necessary to prove that consumers believed that the infringer's toys were sponsored or authorized by the studio that produced the TV series); *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995) (to prove secondary meaning in alleged trade dress, plaintiff need not prove that consumers know the name of the plaintiff company; "the showing required is that consumers associate the trade dress with a single source"). It appears to the Court that Don Estes's name acquired secondary meaning through its use by CM Welding to identify the RPR Concave.

To the extent that Copperhead argues that Don Estes is considered the "origin" of the RPR Concave because he was the face of the company, the Court concludes that such an argument is

foreclosed by the Supreme Court's opinion in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). It can certainly be argued that Don Estes is the "source" of the patented technology. However, as stated by the Court in *Dastar*, "[f]ederal trademark law has no necessary relation to invention or discovery, but rather, by preventing competitors from copying a source-identifying mark. . . . *Id.* at 34. The Court held that the phrase "origin of goods" as used in § 43(a) of the Lanham Act refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37. Although Copperhead argues that CM Welding was merely a distributor for Don Estes's products, there is no question that the RPR Concave was manufactured by CM Welding pursuant to an exclusive manufacturing agreement with Durre Bros. and that it was marketed and sold by CM Welding. The fact that the public did not associate the "Estes" name with CM Welding (the origin of the RPR Concaves), but rather with the product itself (the RPR Concaves) is of no consequence. As stated above, to establish secondary meaning, it is not required that consumers know the source of Estes Concaves or Estes Performance Concaves, but rather that consumers identified the marks with the RPR Concaves. The evidence in the record demonstrates that they did.

### b. Similarity between the parties' marks

Presuming for the moment that Don Estes's name does still retain a source-identifying function, the Court concludes that the "Estes" name and the "Estes Concaves" and "Estes Performance Concaves" marks are substantially similar, especially given Don Estes's prior efforts to personally market that brand.

### c. Degree of competition between the plaintiff's and defendant's goods

In cases involving confusion over endorsement by a plaintiff, "the plaintiff's 'goods' concern the reasons for or source of the plaintiff's fame." *White v. Samsung Electronics Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992). For example, the Ninth Circuit Court of Appeals stated that Vanna White's fame is based on her televised performances as hostess of the television show, "Wheel of Fortune." White's "goods," the Court stated, were therefore associated with the defendant's VCRs because defendant had advertised to its readers that they would be taping the "longest-running game show" on its VCRs well into the future. *Id.*

In the present case, Don Estes's "fame" that Defendants allegedly sought to appropriate was based on Don Estes's association with the RPR Concaves and his patented technology that was incorporated into that product. The "estesperformanceconcaves.com" website sold the XPR

Concave under the same brand name used to market RPR Concaves, a product that Don Estes endorsed. Don Estes's "goods" are therefore highly competitive with the use of his name to market the XPR Concave.

### d. Evidence of Actual Customer Confusion & Degree of Care Among Consumers

In analyzing evidence of actual confusion, the Court looks to *Duluth News-Tribune, a Div. of N.W. Pubs., Inc. v. Mesabi Publish. Co.*, 84 F.3d 1093 (8th Cir. 1996). There, a newspaper publisher that published under the "Duluth News-Tribune" mark brought an action against its competitor publisher for, among other things, trademark infringement and trademark dilution. The plaintiff alleged that the defendant's use of the mark, the "Saturday Daily News & Tribune" created a likelihood of confusion as to the source of or association between the two newspapers. *Id.* at 1096. The plaintiff pointed to the following incidents of actual confusion: 1) plaintiff's receipt of defendants' mail and phone calls; 2) a reporter who alleges that he routinely identifies himself as working for the News-Tribune, and that on a particular occasion he was asked, "which News-Tribune?"; 3) plaintiff's receipt of phone calls asking whether the two newspapers are associated; 4) plaintiff's receipt of a subscription form for defendants' paper; and 5) plaintiff's receipt of a reader's letter proposing corrections to an article that appeared in defendants' paper. *Id.* at 1098.

The court in *Duluth News-Tribune* concluded that the misdirected mail and phone calls was "hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender regarding the reason for the 'confusion.'" *Id.* The court stated that the question to the reporter who was asked to specify which News-Tribune he worked for indicated a distinction in the mind of the questioner, rather than confusion. *Id.* The court stated that "[t]he nature of the question demonstrates an understanding that at least two newspapers contain the words "news" and "tribune." *Id.* Likewise, the calls questioning whether the two papers were associated demonstrate that potential customers do not automatically associate the words 'news' and 'tribune' with 'Duluth News-Tribune.'" *Id.* The court noted that the one incident of actual confusion—a letter from a reader offering plaintiff editorial suggestions regarding an article that appeared in defendants' paper—was insufficient to a likelihood of confusion. The court stated that "several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue as to the likelihood of confusion." *Id.* (citing *Astra Pharmaceutical Prod. Inc. v. Beckman Instruments Inc.*, 718 F.2d 1201, 1207-08 (1st Cir. 1983)). Rather, the court stated, "we look to whether an appreciable

number of ordinary purchasers are likely to be so misled." *Id.* at 1099. With these considerations in mind, the court found that the evidence of "actual customer confusion" was slight.

In *White Hall Pharmacy LLC d/b/a/ Doctor's Orders d/b/a/ Doctor's Orders Pharmacy v. Doctor's Orders RX Inc.*, Civ. No. 19-0366, 2019 WL 3939357 (E.D. Ark. Aug. 20, 2019), plaintiff White Hall Pharmacy LLC, d/b/a/ Doctor's Orders d/b/a/ Doctor's Orders Pharmacy's brought an emergency motion for preliminary injunctive relief against a medical marijuana dispensary using the name "Doctors Orders," "Doctor's Orders Pharmacy," and "Doctors Orders RX," operating about one hour away from plaintiff's pharmacies. *Id.* at *3. The court noted a number of instances of actual confusion which can be summarized as follows:

- Plaintiff received calls requesting information about the marijuana dispensary or wanting to purchase medical marijuana and inquiries as to whether the pharmacy was involved in dispensing marijuana.
- Plaintiff testified that he was asked by members in the community, 5-10% of his customers, and the Arkansas Pharmacists Association about his affiliation with the dispensary.
- Plaintiff testified that local news stations and the local newspaper had contacted him about his affiliation with the dispensary; and
- Several individuals testified that they were initially confused about the affiliation between the plaintiff company and the dispensary.

*Id.* at *16-17. The Court applied the analysis of the Eighth Circuit Court of Appeals in *Duluth News-Tribune* in determining whether the incidents of actual confusion were sufficient to establish that "an appreciable number of ordinary purchasers are likely to be so misled." As did the court in *Duluth News-Tribune*, the court in *White Hall Pharmacy* stated that much of the evidence regarding actual confusion was hearsay "of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sending regarding the *reason* for the 'confusion.'" *Id.* at *17 (quoting *Duluth News-Tribune*, 84 F.3d at 1098). The court noted that one pharmacy employee testified that her location received approximately six phone calls relating to medical marijuana, but that such phone calls had decreased. *Id.* The court stated as well that many of the alleged incidents of actual confusion may be interpreted as proof that consumers note a distinction between the pharmacy and dispensary. *Id.* at *18 (citing *Duluth News-Tribune*, 84 F.3d at 1098 (noting that asking to clarify an affiliation "indicates a distinction in the mind of the questioner, rather than confusion."). Additionally, the court found that there was some indication that defendant's customers would invest some time and energy into investigating defendants' goods and service which weighed against a finding of likelihood of confusion. *Id.* at *19. That

being said, the Court found that overall, the unambiguous incidents of actual confusion[6] supported finding a "likelihood of confusion."

In this case, the alleged incidents of actual confusion are as follows:

- Timothy Gremaud stated that in March 2018 he had used the same informational pamphlets enclosed with his first RPR Concave to order a second RPR Concave, but was instead shipped an XPR Concave from Defendants;

- 

are hearsay evidence of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender regarding the *reason* for the 'confusion.'" In other words, the Court or a jury cannot determine whether the confusion stemmed from a belief that Don Estes sponsored or was affiliated with the XPR Concaves or for some other reason. Even taking at face-value the hearsay testimony of those callers ████████████, the confusion in the marketplace did not seem to stem from whether or not Don Estes endorsed the product, but rather stemmed from the fact that Defendants were using the same marketing channels to sell the XPR Concaves that CM Welding had used to sell a similar product—the RPR Concave. Also, as in *White Hall Pharmacy*, these calls also demonstrate that consumers noted a distinction between the XPR Concave and the RPR Concave and Don Estes's affiliation with the two products. Finally, a single incidence of actual confusion by Tim Gremaud before Defendants began marketing XPR Concaves to the wider market is insufficient for this Court to conclude that an appreciable number of consumers are likely to be confused. Weighing against a likelihood of confusion is also that fact that it appears from the

---

[6] Evidence of actual confusion that the court noted were: plaintiff receiving a text message from an individual seeking a job related to marijuana; someone "tagging" the pharmacy in Facebook post related to defendant's dispensary; and the testimony of two persons in the community who testified that they were confused about the pharmacy's affiliation with the dispensary, although the court noted that there was no evidence that any of those individual mistakenly sought pharmaceutical services from the dispensary. *Id.* at *18.

record that consumers were inquiring and investigating the differences between products before their purchase.

In sum, it appears to the Court that CM Welding and KB Ag, on behalf of CM Welding, invested a lot of time and money to build up the mark, "Estes Performance Concaves" to identify the RPR Concave. At this stage of the litigation, it does not seem that Don Estes will be able to reappropriate the mark for his own use. Additionally, as stated above, the Court finds the consumers of these concave products to be discerning and does not find that Copperhead will be able to prove that an appreciable number of consumers are likely to be confused about whether Don Estes sponsors or approves of the XPR Concave.

## 2. Standing

Even if the Court was to assume that Copperhead had proved that there was a likelihood of confusion in the marketplace regarding whether Don Estes sponsors or endorses XPR Concaves, Copperhead, not Don Estes, is the plaintiff in this lawsuit. Don Estes is not even a party to this action. Defendants raise this issue in their briefs and characterize it as an issue relating to standing.

Copperhead cites to no case, nor was the Court able to find one, that have allowed a third-party not in privity with the purported endorser to bring a false endorsement claim on the endorser's behalf under the Lanham Act. In trademark infringement cases, courts have permitted exclusive licensees of a trademark to bring suits for trademark infringement. However, this is not a trademark infringement case, but rather a false endorsement case.

In *Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1032 (C.D. Cal. 1998) ("*Cairns I*"), the court noted that it seemed unlikely that the public would be confused as to whether Princess Diana had endorsed the defendant's products since the alleged misappropriation occurred after her death. *Id.* at 1032. The court held, however, that § 43(a) may protect the rights of devisees of a deceased celebrity. *Id.* The court noted that § 43(a) prohibits a person from using a mark that is likely to cause confusion as to "the origin, sponsorship, or approval of his or her goods, services, or commercial activities *by another person.*" 15 U.S.C. § 1125(a)(1)(A). "[B]y using the term 'another person,' the Court stated, "Congress selected language broad enough to encompass a claim by a deceased celebrity's Estate or by any celebrity's assignee." *Id.*

In *Cairns II*, however, as noted above, the court concluded that because the image of Princess Diana had been included on a "vast inventory of products sold by innumerable sources," it had lost its "source-identification function of a mark" and therefore provided consumers with no

suggestion that the product was associated with her or her estate. 107 F.Supp.2d 1212, 1217 (C.D. Cal. 2000).

In *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015), the court concluded that a licensee with an exclusive license to design, manufacture, and sell t-shirts and other merchandise bearing Bob Marley's image could bring a false endorsement claim against the defendants for false endorsement under the Lanham Act for using Marley's image on its t-shirts. The court found that, unlike in *Cairns II*, Marley's image retained its source-identification function because Marley sold merchandise bearing his image during his lifetime and his successors-in-interest continued to do so. *Id.* at 1071. Because the plaintiffs owned the rights to the Marley image on t-shirts[7], the court found that the defendant's misappropriation of the Marley image was likely to cause confusion as to whether or not the plaintiff licensee sponsored or approved the defendant's Marley products. *Id.* at 1068, 1071-72.

Unlike in *Marley*, as discussed above, it appears that Don Estes's name lost its source-identifying function it may have had prior to him joining forces with CM Welding. Moreover, Copperhead does not have an exclusive license to use Don Estes's name. The exclusive license and distribution agreement entered into between Copperhead and Don Estes only grants Copperhead the exclusive right to any trademarks previously used to market products incorporating Don Estes's patented technology. For these reasons, the Court concludes that, unlike the facts in *Marley*, it is unlikely that people would likely to be confused as to whether or not Copperhead sponsored or approved of the XPR Concaves.

The Court's conclusion that Copperhead is not the proper party to enforce any rights Don Estes may have in the trademark function of his name is bolstered by the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). There, the defendant contested whether the plaintiff had standing to bring a claim for false advertising under § 43(a) of the Lanham Act. The Supreme Court framed the statutory standing question as one focused on "the scope of the private remedy created by Congress." 572 U.S. at 127. Under *Lexmark*, the first inquiry is whether the plaintiff's interests "fall within the zone of interests protected by the law invoked." *Id.* at 129. With regard to a claim of false advertising, the Court

---

[7]     Also supporting the court's conclusion that the plaintiff licensee sponsored or approved of Marley image on defendant's t-shirts was the fact that the plaintiff licensee was known to be associated with Marley's image because it was common understanding in the licensing industry that the licensee owned the rights to Marley.

held that Congress sought to protect a plaintiff from injuries to commercial interests in reputation or sales. *Id.* at 132.

The Eighth Circuit has not yet spoken on whether this statutory standing test also applies to false endorsement cases, given that a false advertising claim was at issue in *Lexmark*. Even if this Court was to apply *Lexmark* to Copperhead's false endorsement claim, the Court concludes that while Copperhead may be able to allege an injury to its commercial reputation, Copperhead does not satisfy the second statutory standing requirement, that its injuries were a proximate cause of the alleged misappropriation of Don Estes's name. *See id.* at 132. In order to prove proximate cause in the context of a § 43(a) claim, the Court in *Lexmark* stated that a plaintiff:

> [M]ust show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff. That showing is generally not made when the deception produces injuries to a fellow commercial act that in turn affect the plaintiff. For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's inability to meet [its] financial obligations.

*Lexmark*, 572 U.S. at 134. The Court stated that there is "a 'general tendency' not to stretch proximate causation 'beyond the first step.'" *Id.* at 139 (citing *Holmes*, 503 U.S. at 271). The reason for this general tendency, the Court stated "is that there ordinarily is 'a discontinuity' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct), but might instead have resulted from "any number of [other] reasons." *Id.* at 140 (quoting *Anza*, 547 U.S. at 458-59).

Even if the Court was to find that Copperhead had a commercial interest in whether or not Don Estes's name was misappropriated by Defendants, its injuries are too far removed from injuries sustained by Don Estes in his own reputation.

### C. Cyberpiracy Claim under 43(a) of the Lanham Act

The Anticybersquatting Consumer Protection Act, which amended the Lanham Act, state:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—
    (I)      in the case of mark that is distinctive at the time of the registration of the domain name, is identical or confusingly similar to that mark;

15 U.S.C. § 1125(d)(1)(A). As noted by the Eighth Circuit Court of Appeals:

> The legislative history of the ACPA includes findings that cybersquatters were engaging in consumer fraud and creating public confusion as to the true source or sponsorship of goods and services in a way that would impair electronic commerce, deprive trademark owners of substantial revenues and consumer goodwill, and place overwhelming burdens on trademark owners in protecting their valuable intellectual property. The Senate report included concerns about misleading users of the Internet: "[I]f someone is operating a website under another brand owner's trademark, such a site called 'cocacola.com' or 'levis.com,' consumers bear significant risk of being deceived and defrauded, or at a minimum, confused."

*Coca-Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir. 2004) (citing S.Rep. No. 106-40, at *2, *5 (findings)).

Copperhead alleges that Defendants have registered and used domain names estesperformanceconcave.com and estesconcaves.com, that these URLs are confusingly similar to and dilutive of Don Estes's personal name, and that Defendants have a bad faith intent to profit from Don Estes's name. Doc. 1, ¶¶ 84, 85.

The Court concludes that Copperhead is not likely to succeed on the merits of its cyberpiracy claims for the same reasons that it is not likely to succeed on the merits of its false endorsement claims.

### D. Cancellation

Plaintiffs argue that they are entitled to preliminary injunctive relief because they are likely to succeed in cancelling Defendant's trademarks under 15 U.S.C. § 1119 because Defendants: 1) failing to obtain written consent of Don Estes to use his name in their registered mark in violation of 15 U.S.C. § 1052(c) and 2) obtained the registration of the trademarks fraudulently in violation of 15 U.S.C. § 1164(3).

Title 15, Section 1119 of the United States Code, 15 U.S.C. § 1119, is not an independent cause of action, but rather defines available remedies for some other violation of the trademark laws. *See* 15 U.S.C. § 1119 (gives district courts the authority to cancel a trademark registration "[i]n any action involving a registered mark"); *see also SmileDirectClub, LLC v. Kerkely*, Civ. No.

18-1236, 2018 WL 8131096, at *8-9 (C.D. Cal. Oct. 26, 2018) (holding that cancellation is an available remedy for actions in which there is an independent cause of action involving harm caused by the trademark registration which the party seeks to cancel); *E. Iowa Plastics, Inc. v. PI, Inc.*, 832 F.3d 899, 904 (8th Cir. 2016) ("Once the district court had determined that [the plaintiff] did not suffer any damages from [the defendant's] violation of [15 U.S.C. § 1120], there was not further basis for [the plaintiff] to have standing to seek cancellation of the [trademark] registrations."); *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt, Inc.*, 744 F.3d 595, 587-600 (9th Cir. 2014) (affirming dismissal of § 1119 cancellation claim where the plaintiff maintained no other ongoing cause of action); *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 98 (2d Cir. 2011) (no subject matter jurisdiction over § 1119 claim where party mooted its trademark infringement claim by executing a covenant not to sue); *Thomas & Betts Corp. v. Panduit Corp.*, 48 F.Supp.2d 1088, 1093 (N.D. Ill. 1999) (stating that 15 U.S.C. § 1119 is not an independent source of jurisdiction, but rather defines available remedies for actions involving a registered mark).

And while 15 U.S.C. § 1064 allows for cancellation of trademark registrations by one who "believes that he is or will be damaged by the registration," § 1064, relates only to administrative Trademark Board proceedings in the Patent and Trademark Office. It does not authorize suits for cancellation in a federal district court. McCarthy, § 30:110, 30-302; *Pogrebnoy v. Russian Newspaper Dist., Inc.,* 289 F.Supp.2d 1061, 1071 (C.D. Cal. 2017) (stating that 15 U.S.C. §1052(d) and 15 U.S.C. § 1064 only apply to cancellation proceedings before the USPTO).

Because Copperhead's cancellation claims are not a separate cause of action, they do not provide a basis upon which the Court may issue the preliminary injunctive relief that Copperhead requested.

### III.  Motion to Stay

While the validity of the patents and the ownership of the RPR trademark is being litigated elsewhere, the unfair competition claims alleged by Copperhead are not being addressed, as far as the Court is aware, in any other jurisdiction. The parties have already spent considerable time and money litigating this case in this forum and the Court has found that it has personal jurisdiction over Defendants in this matter. Defendants' motion to stay is denied.

Accordingly, it is hereby ORDERED:

1) Mitchell and Robertson's motion for joinder, Doc. 42, is GRANTED;

2) Defendants' motion to dismiss for lack of personal jurisdiction is DENIED;

3) Copperhead's motion to set hearing for preliminary injunctive relief, Doc. 23, is DENIED;

4) Copperhead's motion for preliminary and declaratory relief, Doc. 26, is DENIED;

5) Defendants' motion to stay, Doc. 66, is DENIED; and

6) The Court will issue an order in the near future addressing the remaining claims in Defendant's Motion to Dismiss, Doc. 14.

Dated this 24ᵗ day of September, 2019.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

BY: _____
(SEAL)          DEPUTY